UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:19-CR-831 |
| | § | |
| EDUARDO RUIZ-CORTEZ, *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING DEFENDANT
EDUARDO RUIZ-CORTEZ'S MOTION TO DISMISS**

The United States accused Eduardo Ruiz-Cortez (Defendant) of violating its laws,

charging him with illegally transporting an undocumented alien within the country and

conspiring to do the same. D.E. 41. The United States, however, deported a potential

defense witness—in violation of court order—before defense counsel could elicit trial

testimony or even conduct a witness interview. Defendant moved to dismiss his superseding

indictment with prejudice, citing violations of his Fifth and Sixth Amendment rights. D.E.

47.[1] For the following reasons, his motion is GRANTED. D.E. 47.

**BACKGROUND**

According to the government, on June 8, 2019, Defendant drove a black Honda Civic

with two passengers to the U.S. Border Patrol Checkpoint near Sarita, Texas. The

passengers were Fernando Juarez-Gonzalez—the undocumented alien who Defendant is

accused of transporting—and one other unnamed person. A Border Patrol Agent questioned

---

[1] Defendant initially moved to dismiss his original indictment, which charged one count of illegally transporting an undocumented alien. D.E. 39. The government responded to this motion. D.E. 40. Defendant then amended his motion to address the superseding indictment, which added one count of conspiracy to transport an undocumented alien. D.E. 47. The government has not responded to the amended motion. The Court takes the government's response to Defendant's initial motion as its response to Defendant's amended motion, since Defendant's arguments have not changed.

the passengers and then detained everyone in the car after Juarez-Gonzalez admitted he was in the U.S. illegally. Sometime after being detained, Juarez-Gonzales "admitted" to the government that he had previously informed Defendant he was in the country illegally. D.E. 40, p. 4.

Gerardo Diaz-Rueda was not in the black Honda Civic or at the Sarita checkpoint that day. According to the government, he was in federal custody, having been charged with illegal re-entry into the United States. Nonetheless, Defendant's attorney later came to believe Diaz-Rueda could be a "key witness," and attempted to secure his interview and trial testimony. D.E. 23. Notably, the prosecutor assisted defense counsel in locating Diaz-Rueda. After one attempt to secure Diaz-Rueda's testimony failed for procedural reasons, defense counsel filed an unopposed motion for an arrest warrant on July 23, 2019. D.E. 27.

In his motion, counsel argued Diaz-Rueda could "testify to some exculpating information." D.E. 27, p. 1. As explained in defense counsel's sworn affidavit, Defendant previously encountered Diaz-Rueda at the Brooks County Detention Center in Falfurrias, Texas. D.E. 27-2, p. 1. Diaz-Rueda told Defendant he previously met Juarez-Gonzales while both were being held at the Corpus Christi Border Patrol Station. D.E. 27-2, p. 1. Juarez-Gonzales told Diaz-Rueda that, if he was going to jail, he was "not going to go down alone." D.E. 27-2, p. 1.[2]

Defendant claimed this showed Juarez-Gonzales had the "motive and intent" to falsely claim Defendant knew Juarez-Gonzalez had illegally entered the country and intended to "smuggle" Juarez-Gonzalez. D.E. 27-2, p. 1. Defendant needed an arrest

---

[2] Defense counsel appears to have inadvertently switched Diaz-Rueda and Juarez-Gonzalez's names in his supporting affidavit, suggesting that Diaz-Rueda said he "was not going to go down alone." The briefing on this motion clarifies any confusion and the government does not argue that Diaz-Rueda made the statement.

warrant because Diaz-Rueda would "most likely be deported soon," as he recently pleaded guilty to illegal reentry and was being held by Immigration and Customs Enforcement at its Montgomery Processing Center in Conroe, Texas. D.E. 27.

Magistrate Judge Janice Ellington granted the defense's motion on the day after it was filed, and also issued a writ of habeas corpus ad testificandum. D.E. 29, 30. Her order required that Diaz-Rueda be arrested and detained as a material witness for Defendant pending trial or unless otherwise ordered by the court. D.E. 29. The writ commanded the warden of the Montgomery Processing Center to deliver Diaz-Rueda to the U.S. Marshal for a hearing on August 21, 2019 and for trial on September 9, 2019. D.E. 30. In anticipation of these proceedings, Diaz-Rueda was later appointed counsel.

Despite the writ's commands to the warden, Diaz-Rueda never appeared at the August 21 hearing. The government had deported him on July 31—one week after Judge Ellington granted Defendant's motion and issued the writ.

## DISCUSSION

### I. Defendant Ruiz-Cortez's Motion to Dismiss

Defendant argues the government's deportation of Diaz-Rueda violated his Fifth Amendment right to due process and his Sixth Amendment right to compulsory process. For its part, the government primarily argues Defendant cannot show the deportation caused any prejudice, citing *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982). Beyond that, it makes two secondary arguments. It claims it assisted defense counsel in locating Diaz-Rueda. And it says, "there is no reasonable doubt in this case." D.E. 40, p. 4. For the following reasons, these arguments fail, and Defendant has shown there is a "reasonable

likelihood" Diaz-Rueda's testimony could have affected a jury's judgment. *Valenzuela-Bernal*, 458 U.S. at 874.

At the outset, the government's secondary arguments lack any merit. Its claim that "there is no reasonable doubt in this case" ignores two of our Constitution's fundamental guarantees: the presumption of innocence and trial by jury. D.E. 40, p. 4. The prosecution also misses the mark in arguing it helped defense counsel locate Diaz-Rueda. While commendable, this fails to address the point of defendant's motion. It is not based on some unreasonable delay in locating Diaz-Rueda, but upon his deportation in violation of court order.

## II. Case Law on Deported Witnesses

### A. Supreme Court Precedent

The government's prejudice argument requires closer examination, particularly its reliance on the Supreme Court's decision in *Valenzuela-Bernal*.[3] There, the Court held the government's responsibility to enforce immigration laws "justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." *Valenzuela-Bernal*, 458 U.S. at 872. Given this consideration, "[s]anctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id*. at 873.

---

[3] The Court considers the Fifth and Sixth Amendment claims together, as the Supreme Court held that they involve "at least the same materiality requirement." *Valenzuela-Bernal*, 458 U.S. at 872.

While the Court held defendants must make a "plausible showing" of prejudice, it also recognized that deportation can severely undermine their ability to do so. It explained that deportation "deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess." *Id*. For this reason, a defendant "cannot be expected to render a detailed description of their lost testimony." *Id*. Courts should "afford some leeway," as the defendant "necessarily proffers a description of the material evidence rather than the evidence itself." *Id*. at 874.

Applying these rules, the Court in *Valenzuela-Bernal* held the defendant was not entitled to dismissal of his charges because (1) the government deported potential witnesses after an Assistant U.S. Attorney determined they lacked any relevant information and (2) the defendant "made no effort to explain what material, favorable evidence the deported [persons] would have provided for his defense." *Id*. at 861, 874.

## B. Fifth Circuit Precedent

In 2006, the Fifth Circuit recognized that it "had not yet fully defined the contours of a claim under *Valenzuela–Bernal*." *United States v. Gonzales*, 436 F.3d 560, 578 (5th Cir. 2006). It proceeded to explain that, in addition to prejudice, other circuits had required defendants to show bad faith by the government. *Id*. But they had not uniformly agreed on the meaning of "bad faith." *Id*.

For its part, the Fifth Circuit expressly declined to adopt a general bad faith requirement, but held the defendant was not entitled to relief under the plain error standard without such a showing. And, in the case at hand, the defendant could not carry his burden. To the contrary, the government acted in good faith because the defendant's arrest occurred after the potential witnesses were deported and the defendant "actually participated" in

deporting them—the defendant was an Immigration and Naturalization Service officer who committed criminal acts while on duty. *Id*. at 579.

While the court's decision did not turn on prejudice, its discussion of the issue provides guidance here. There, the defendant was charged with acting with deliberate indifference to the serious medical needs of a person and denying them medical care. This required the government to prove the defendant knew the person was injured. *Id*. at 578–79. Yet the government deported two witnesses who could have testified they believed the victim was faking injury. *Id*. Their deportation deprived the defendant of testimony that could have negated the knowledge element of his charge. *Id*. Under these facts, the prejudice requirement was "likely satisfied." *Id*. at 578.

### III.    Prejudice to Defendant Ruiz-Cortez

**A.    The government lacked justification for promptly deporting Diaz-Rueda under *Valenzuela-Bernal*.**

At the outset, this case differs from *Valenzuela-Bernal* in an important way: The government here did ***not*** make any determination, good faith or otherwise, that Diaz-Rueda lacked relevant or exculpatory information. As it concedes in its briefing, "the United States was unaware of his alleged connection to the case." D.E. 40, p. 6.

But even this does not tell the entire story. The government ***was*** unaware of Diaz-Rueda's alleged connection to this case—until defense counsel apprised them of it. At the latest, the government learned of it when Judge Ellington commanded the warden to produce Diaz-Rueda at the August 21 hearing and September 9 trial. Because the government never made a good faith determination that Diaz-Rueda lacked relevant information and was at

least on notice that he might have such information, it lacked justification for promptly

deporting Diaz-Rueda under *Valenzuela-Bernal*.

In fact, the government had a very good reason ***not*** to deport Diaz-Rueda: Judge

Ellington clearly ordered it not to do so. The government does not even attempt to explain

why it ignored this order.

**B.    Defendant has shown there is a reasonable likelihood Diaz-Rueda's testimony could have affected a jury's judgment.**

As required by *Valenzuela-Bernal*, Defendant is entitled to "leeway" in showing

prejudice because the government deprived him of the opportunity to even interview Diaz-

Rueda. Even without such leniency, Defendant has shown adequate prejudice. As the

government suggests in its briefing, there seems to be overwhelming evidence that the

defendant committed the act of transporting an undocumented alien. D.E. 40, p. 4.

But there is not overwhelming evidence that Defendant (1) acted knowing or in

reckless disregard of the fact that the alien was illegally present in the U.S., or (2) knowingly

agreed to transport such an alien—essential elements of the alleged crimes. For this reason,

Juarez-Gonzalez's testimony that he "told the defendant that he was illegally present in the

United States" would likely be a key point at trial. D.E. 40, p. 4. The government points to

no other evidence of Defendant's knowledge.

And, as Defendant argues, Diaz-Rueda's testimony could have refuted such

testimony. D.E. 39, p. 4. He is the only person who heard Juarez-Gonzalez's statement that

he "was not going to go down alone." Testimony on this statement could have supported the

defense's potential argument that Juarez-Gonzalez intended to falsely testify in order to

secure a plea deal on potential illegal re-entry charges. D.E. 39, p. 4. But it is no longer

available.  In sum, the prejudice here mirrors the prejudice observed in *United States v. Gonzales*.[4]

**CONCLUSION**

The United States deported a potential defense witness—in violation of court order—before defense counsel could elicit trial testimony or even conduct a witness interview.  And it did so despite notice that he could have exculpatory information regarding the credibility of a key government witness.  That information is no longer available.  Defendant has therefore shown there is a "reasonable likelihood" the witness's testimony could have affected a jury's judgment.  His motion is GRANTED.

ORDERED this 29th day of October, 2019.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

---

[4] The government argues Diaz-Rueda could not provide material testimony because he did not personally witness the defendant stop at the Sarita check point.  This argument is meritless.  One need not personally witness a crime to have relevant information.